IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TODD LAUSTER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Civil No.   15-cv-1134-JPG-CJP |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant.[1] | ) |

**MEMORANDUM and ORDER**

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Todd Lauster, represented by counsel, seeks review of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for disability benefits in April 2007, alleging disability beginning on September 15, 2006. (Tr. 718.)  His application was denied by an ALJ in April 2010 (Tr. 715-726.)  Mr. Lauster then filed a new claim for disability benefits in June 2010, which was granted by the state agency at the reconsideration level.  However, on August 15, 2011, the Appeals Council vacated both the denial from April 2010 and the favorable decision on the subsequent application because they were inconsistent.  The applications were consolidated and remanded for further proceedings.  (Tr. 727-735.)  A second ALJ denied the application in July 2013 (Tr. 1310-1328.), and the Appeals Council again vacated the decision (Tr. 1329-1331.)

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.   *See* https://www.ssa.gov/agency/ commissioner.html (visited Feb. 7, 2017).   She is automatically substituted as defendant in this case.   *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

The claim was then assigned to ALJ Stuart T. Janney. After holding an evidentiary hearing, ALJ Janney denied the application in a decision dated July 9, 2014.[2] (Tr. 19-38.) This time, the Appeals Council denied plaintiff's request for review, and the July 9, 2014, decision became the final agency decision subject to judicial review.  (Tr. 9.)

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ failed to explain the weight he assigned to the medical opinions and violated the Appeals Council directive to properly consider the opinion of state agency medical consultant M.W. DiFonso.

2. The ALJ's assessment of plaintiff's residual functional capacity (RFC) failed to accommodate his impairments in combination and failed to account for his moderate limitations in social functioning and in maintaining concentration, persistence or pace.

3. The credibility determination was erroneous.

4. The ALJ failed to resolve inconsistencies between the testimony of the vocational expert and the *Dictionary of Occupational Titles*.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any

---

[2] Plaintiff's brief states that ALJ Janney's decision was not included in the administrative transcript filed in this Court. *See* Doc. 14, p. 2, n.1. That is incorrect. The decision is located at Tr. 19-38, which can be found at Doc. 12, pp. 23-42 as numbered by the CM/ECF system.

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3) & 1382c(a)(3)(C). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5)

3

whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to understand that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive…." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Lauster was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the Court takes into consideration the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Janney followed the five-step analytical framework described above. He determined that Mr. Lauster had not been engaged in substantial gainful activity since the alleged onset date. He was insured for DIB only through December 31, 2009.[4]

The ALJ found that plaintiff had severe impairments of cervical spine degenerative disc disease; lumbar spine degenerative disc disease with a spontaneously resolved annular tear; left shoulder impingement and acromioclavicular separation status post-surgical repair; right lateral epicondylitis, olecranon bursitis and internal derangement treated with arthroscopic surgery; moderate left ulnar neuropathy; late onset dysthymic disorder; major depressive disorder, recurrent; depression; adjustment disorder with mixed emotional features; anxiety disorder, not otherwise specified; generalized anxiety disorder; social phobia; chronic pain syndrome; personality disorder, not otherwise specified; and history of alcohol abuse. He found that these impairments do not meet or equal a listed impairment.

ALJ Janney concluded that plaintiff had the residual functional capacity to perform work at the light exertional level, limited to occasional climbing of ropes, ladders and scaffolding; frequent climbing of ramps and stairs; frequent balancing, stooping, kneeling, crouching, and crawling; no

---

[4] The date last insured is relevant only to the claim for DIB.

overhead reaching with bilateral upper extremities, but occasional reaching in all other directions; and frequent bilateral handling, fingering and feeling. He also had mental limitations consisting of only rote or routine instructions that require the exercise of little independent judgment or decision-making for the two-hour segments that make up an eight-hour workday at a consistent pace, but not if the tasks are complex or detailed; a task-oriented or object-oriented setting as opposed to a service-oriented setting; frequent interaction with co-workers and supervisors; and only occasional interaction with the public.

Based on the testimony of a vocational expert (VE), the ALJ determined that plaintiff could not do his past work, but he could perform other jobs which exist in significant numbers in the national and local economies, and, therefore, he was not disabled.

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1.    Evidentiary Hearing**

Plaintiff was represented by counsel at the hearing before ALJ Janney in May 2014. (Tr. 1462.)

Plaintiff was 43 years old at the time of the hearing. (Tr. 1466.) He lived with his wife and three children, ages 13, 10 and 7. (Tr. 1468.) He had worked for a company fabricating piping systems for airports. He also had done heating and cooling repairs and had driven a truck. (Tr. 1472-75.)

Plaintiff testified that he was unable to work because of pain in his neck, low back, left

shoulder, shoulder blade area, left arm, and both legs, along with depression. (Tr. 1477.) He had taken morphine for a number of years. (Tr. 1479.) He had gone to a pain clinic and received injections in his neck, shoulder, elbow and back. (Tr. 1480.)

He began seeing a psychiatrist in 2007 because of anger problems and depression. His depression made him lose interest in things and have no ambition. He was forgetful. His depression and pain interfered with his concentration. He was taking Prozac, Lamictal and Buspar. (Tr. 1481-83.)

He did a few things around the house like vacuuming, sweeping, and mowing the lawn. His son usually had to finish the mowing. He tried to do household repairs, but he often became frustrated and aggravated and did not finish. He tried to attend some of his children's activities but had difficulty making it all the way through the events. For instance, he had to leave baseball games and go lay in his vehicle. He did not go grocery shopping because he could not stand and walk that long. (1485-86.)

He went deer hunting once in November 2013. He was not able to get into a stand; he just sat on the ground. He was out in the woods behind his house for about an hour and a half. (Tr. 1490).

A VE also testified. The ALJ asked the VE to assume a hypothetical question which corresponded to the RFC assessment. The VE testified that this hypothetical person could not do plaintiff's past work but he could do jobs which exist in significant numbers, such as laminating machine offbearer, scaling machine operator and fruit distributor. (Tr. 1502-04.)

**2.   Medical Records**

Plaintiff injured his left shoulder in a fall at work in 2001. He underwent left shoulder

7

arthroscopy with decompression.  In 2003, he had another fall at work, this time injuring his right shoulder.  He had surgery on his right shoulder.  He also underwent a right elbow tendon release. (Tr. 712.)

The alleged onset of disability is September 15, 2006.

Plaintiff began seeing Dr. Qureshi, a psychiatrist, in 2007.  On the first visit, he complained of feeling anxious, stressed and "mad all day."  (Tr. 680.)  In August 2008, at the annual psychiatric update, Dr. Qureshi noted diagnoses of major depressive disorder, recurrent, and anxiety disorder, NOS.  He decreased the dosage of Lexapro due to side effects.  (Tr. 704-05.)  Plaintiff was seen regularly by Dr. Qureshi or Physician's Assistant Gabriel Martin through 2011.  (Tr. 996-1014, 1183-97.)  Ativan and Pristiq were prescribed in addition to Lexapro.  The treatment notes generally indicated either no impairment or mild impairment in attention, concentration, memory, insight and judgment.  In October 2010, plaintiff was taking Pristiq and Ativan.  He complained of constant irritability and increased anxiety around crowds and with people in public settings.  He stated that his medications were helpful and he did not want to change.  (Tr. 1190-91.)  In February 2011, he complained of feelings of hopelessness and worthlessness, as well as increased frustration and agitation.  He was switched from Pristiq to Savella.  (Tr. 1196-97.)

Mr. Lauster began receiving mental health care from Dr. Hess at the H-Group in April 2011.  He testified at the 2013 hearing that he was dismissed from Dr. Qureshi's practice because he got into an argument with a staff member there.  (Tr. 1441.)  He was prescribed medication and was also seen for regular counseling at the H-Group.  He was seen there through June 2013. (Tr. 1198-1240, 1374-77.)  The primary diagnosis was depression.  On most visits, he was noted

to be neat and cooperative with no suicidal or homicidal ideation and no hallucinations. Thought processes were linear and goal-directed. His mood was sometimes normal and sometimes irritable. His affect was usually full, although it was on occasion described as blunted or constricted.

Dr. Pass is plaintiff's primary care physician. In July 2008, Dr. Pass noted gradually increasing low back pain and sciatica. He prescribed Vicodin. (Tr. 674.) Mr. Lauster continued to see Dr. Pass through at least December 2013. (Tr. 932-39, 990-92, 1242-1309, 1378-88.) Dr. Pass noted back, neck and shoulder pain and chronic pain syndrome. He prescribed various medications, including morphine, Vicodin and Fentanyl patches.

Dr. Pass ordered an MRI of plaintiff's lumbar spine in July 2009. This study was negative for canal stenosis, disc bulge or neural foraminal narrowing. In addition, the report states that a posterior annular tear that was present on a prior study was no longer present. (Tr. 939.)

In January 2010, an EMG was done to rule out left upper extremity ulnar neuropathy/radiculopathy and right lower extremity neuropathy/radiculopathy. This study showed moderate left ulnar neuropathy at the elbow and no evidence of median neuropathy at the wrist, peripheral neuropathy, cervical radiculopathy or lumbo-sacral radiculopathy. (Tr. 909.)

An MRI of the cervical spine done in May 2011 showed multilevel degenerative disc disease and foraminal stenosis with no cervical cord compression or central canal stenosis. (Tr. 1274.)

3.  **Medical Opinions**

There are a number of medical opinions in the administrative record. The Court will highlight only those opinions discussed by plaintiff in his brief.

In August 2007, Harry Deppe, Ph.D., performed a consultative psychological exam at the request of the agency. Dr. Deppe concluded that plaintiff had fair to good ability to relate to others, and fair ability to understand and follow simple instructions, maintain attention required to perform simple, repetitive tasks, and to withstand the stress and pressures of day-to-day work activity. (Tr. 193-96.)

PA Gabriel Martin completed a form furnished to him by plaintiff's counsel in March 2009. This report was counter-signed by Dr. Qureshi. The form asked Mr. Martin to check whether the patient had "marked restriction" in various areas of functioning. The form did not provide the opportunity to rate the patient's level of restriction as something less than marked. In the sections on anxiety related disorder, Mr. Martin checked the blanks to indicate marked restriction in all possible areas of functioning except for one. The only area he did not check was maintaining concentration, persistence or pace. Mr. Martin indicated that plaintiff had experienced repeated episodes of decompensation, each of extended duration resulting from anxiety disorder and personality disorder. In the section on affective disorder, Mr. Martin indicated that plaintiff had marked restriction in maintaining concentration, persistence or pace. On another form, Mr. Martin or Dr. Qureshi wrote that plaintiff had "responded well to medicine" and his prognosis was fair. (Tr. 485-93.)

Fred Klug Ph.D., performed a consultative psychological exam at the request of the agency on September 14, 2010. Dr. Klug concluded that plaintiff's concentration was poor, short term memory was impaired, long term memory was marginal, and reasoning, abstract thinking, insight and judgment were poor. Intellectual functioning appeared borderline. (Tr. 963-66.)

Gabriel Martin completed another report in January 2011. He indicated diagnoses of

major depressive disorder, recurrent, and anxiety disorder. He stated that encounters with other people caused plaintiff increased anxiety, and he avoided these settings. He had "poor/inconsistent" interpersonal skills. He was "very irritable" at times with "explosive behavior." Mr. Martin indicated that plaintiff would not be able to function in a competitive work setting because Mr. Martin "would be concerned about public interaction." (Tr. 994-95.)

Charles Hess, Ph.D., wrote a letter in September 2011 regarding plaintiff's condition. Dr. Hess had been treating him since June 2011. He stated that plaintiff had a long history of social anxiety, beginning in grade school, and that he met the criteria for a diagnosis of social phobia (social anxiety disorder). He said, "Such a disorder poses a barrier to occupations requiring significant interactions with others." (Tr. 903.)

In January 2011, M.W. DiFonso, Psy.D., a state agency consultant, assessed plaintiff's mental RFC by completing an agency form based on a review of the records. Dr. DiFonso checked boxes indicating that plaintiff was markedly limited in several areas, including ability to maintain attention and concentration for extended periods, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and ability to accept instructions and respond to criticism from supervisors. In the area of the form for narrative remarks, Dr. DiFonso stated that plaintiff's "ability to maintain task-focused behavior is markedly limited by episodes of deterioration due to symptoms of depression or anxiety" and he was "markedly limited for sustained work effort in competitive work setting." (Tr. 1032-34.) Dr. DiFonso also completed a Psychiatric Review Technique form at the same time. On that form, she indicated that she reviewed Dr. Deppe's report along with records from Rural Health (Dr. Qureshi's office) dated July 8, 2009, to January 6, 2011. She stated that the records indicated

worsening of symptoms around December 10, 2009, with intermittent crying spells, withdrawal, isolation and numerous conflicts with others. (Tr. 1030.) She also indicated that plaintiff had "one or two" episodes of decompensation. (Tr. 1028.)

Dr. Pass wrote a letter in June 2012, stating that he had been treating plaintiff since 2007. Dr. Pass saw him for a number of problems, but the "chief problem" was chronic pain in the shoulder, neck and back. He stated that plaintiff was unable to maintain employment due to ongoing neck and back pain, that he required the use of narcotic pain medication, and that he must rest after only an hour or two of household chores or similar work. Dr. Pass acknowledged that many of plaintiff's complaints were subjective and difficult to objectively verify, but he noted that an MRI of the cervical spine showed multilevel foraminal stenosis. (Tr. 1096.)

**4.      Subsequent Application**

Some of the records related to the subsequent application are not included in the administrative transcript. *See* Doc. 12, pp. 1 and 6, noting that Exhibits 1SSI through 9SSI "are not available for inclusion."

Plaintiff's subsequent application was granted on January 28, 2011. (Tr. 727.) The Appeals Council Notice vacating the favorable determination states that the state agency found plaintiff to be disabled based on a consultative psychological examination dated September 23, 2009. The state agency found plaintiff to be disabled because his "mental impairments, depression and anxiety, markedly limited [his] ability to maintain task-focused behavior and to sustain work efforts in a competitive work setting." (Tr. 729.) The ALJ's decision denying the consolidated applications after this remand mentioned examinations by Dr. Deppe (August 6, 2007) and Dr. Klug (September 14, 2010), but did not mention a consultative examination dated

September 23, 2009. (Tr. 1313-28.)

This Court has painstakingly reviewed the administrative transcript, and failed to locate a record of a consultative psychological examination dated September 23, 2009.[5]

## Analysis

The Court turns first to plaintiff's challenge to the ALJ's credibility findings.

Plaintiff argues that the ALJ erred in his credibility determination because he failed to meaningfully consider the factors set forth in SSR 96-7 and relied too heavily on his daily activities and the lack of objective medical evidence.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186 at *3.[6]

---

[5] The administrate transcript, which was prepared by the agency, is in sorry shape. The transcript is full of medical records that are duplicates or even triplicates, and the index provided by the agency (Doc. 12, pp. 2-12) is so lacking in detail with regard to Tr. 121 to 714 as to be almost completely useless.

[6] SSR 96-7p was superseded by SSR 16-3p, 2016 WL 1119029. SSR 16-3p became effective on March 28, 2016. *See* 2016 WL 1237954 (setting forth the effective date). SSR 16-3p eliminates the use of the term "credibility" and clarifies that symptom evaluation is "not an examination of an individual's character." 2016 WL 1119029, at *1.

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Id.*; *see also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record.") If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Here, the reasons given by the ALJ for rejecting plaintiff's statements are not supported by the record and are not valid. ALJ Janney said that he found plaintiff not be credible because of his daily activities, the results of the lumber MRI, and the absence of evidence of carpal tunnel syndrome. (Tr. 29.)

The ALJ stated that plaintiff admitted to doing some light housework and mowing the lawn for about half an hour, which is correct. However the ALJ also said plaintiff admitted to "regularly taking walks of about 1½ hours in duration," which is not correct. Further, the ALJ said that he had been deer hunting "as late as November 2013," which is misleading.

The ALJ questioned plaintiff about deer hunting at the hearing in May 2014. Plaintiff said that he only went hunting once in 2013, and that had been in November. He said that he was only out in the woods (right at his backyard) for about an hour and a half total, and that he sat on the ground. He did not say that he walked on that occasion for an hour and a half. (Tr. 1489-90.) The Court has carefully reviewed the entire administrative record, including the transcripts of all three evidentiary hearings, and has not located any statement by plaintiff that he regularly took

---

SSR 16-3p continues to require the ALJ to consider the factors set forth above, which are derived from the applicable regulations. 2016 WL 1119029, at *5.

14

walks lasting one and one-half hours.

The ALJ mischaracterized plaintiff's activities in other respects as well. He said that plaintiff worked outside on a tractor in July 2012 without complaints of pain. This is a reference to a note in Dr. Pass's records stating that plaintiff had respiratory symptoms after having been outside working on a tractor with cleaners. (Tr. 125.) The ALJ did not question plaintiff about this event; for all the record shows, he may have been doing nothing more strenuous than wiping down a tractor with a rag. Plaintiff did testify that he attended some of his children's events, but also said that he had trouble making it all the way through games and would go to his vehicle and lay down. (Tr. 1486.)

It is, of course, appropriate for the ALJ to consider daily activities when evaluating credibility, but "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has called improper consideration of daily activities "a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation." *Moore v. Colvin*, 743 F. 3d 1118, 1126 (7th Cir. 2014). Here, while the ALJ did not explicitly say that plaintiff's daily activities equaled an ability to work full-time, he said that plaintiff's "alleged physical limitation secondary to pain" and his assertion that "activity aggravates his symptoms" were "inconsistent" with his activities. (Tr. 29.) Crucially, those conclusions were based on an incorrect understanding of plaintiff's activities and were not supported by the record. Thus, the credibility analysis was "patently wrong." *Ghiselli v. Colvin*, 837 F.3d 771, 779 (7th Cir. 2016).

The erroneous credibility determination requires remand. "An erroneous credibility

finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014); *see also Ghiselli, supra* (noting that an erroneous credibility determination cannot be deemed harmless error where it informed the ALJ's findings with respect to plaintiff's RFC and ability to do past work and other work).

Reconsideration of plaintiff's credibility will also require a "fresh look" at the medical opinions and plaintiff's RFC. *Pierce*, 739 F.3d at 1051. It is therefore not necessary to analyze plaintiff's other points in detail. The Court nevertheless makes the following observations with regard to weighing the medical opinions.

The ALJ rejected the opinion of Mr. Martin/Dr. Qureshi because they indicated that plaintiff had episodes of decompensation. The ALJ thought that was wrong because plaintiff had not required inpatient treatment for a mental impairment. (Tr. 33.) This conclusion reveals a misunderstanding of the meaning of "episode of decompensation." In fact, inpatient hospitalization is not required for a finding of an episode of decompensation. *Yurt v. Colvin*, 758 F.3d 850, 861 (7th Cir. 2014). In addition, the ALJ ignored the fact that Dr. DiFonso also found that plaintiff had one or two episodes of decompensation.

Plaintiff is correct that the ALJ failed to adequately consider Dr. DiFonso's opinion. She is a state agency consultant. "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2. The ALJ is required by 20 CFR §§ 404.1527(f) and 416.927(f) to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining

16

physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. *Id.* The ALJ dismissed her opinions because Dr. DiFonso relied on Dr. Klug's report, but he ignored the fact that Dr. DiFonso also relied upon Dr. Qureshi's office notes.

Lastly, ALJ Janney did not mention the consultative psychological examination dated September 23, 2009, which caused the state agency to approve plaintiff's subsequent application. As was explained above, the Court was unable to locate that report. It is possible that the report was not before ALJ Janney. That report was obviously favorable to plaintiff, and its absence from the record is troubling.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Lauster is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Todd Lauster's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:** **February 8, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**